2024 IL App (1st) 200628-U

FIFTH DIVISION
April 5, 2024

No. 1-20-0628

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 18 CR 17293 |
| | ) | |
| ERWIN TAYLOR A/K/A IRVING TAYLOR, | ) ) | Honorable Earl Hoffenberg, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE MIKVA delivered the judgment of the court.
Justices Lyle and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's sentences for convictions for aggravated battery of a peace officer were not an abuse of discretion.

¶ 2    Following a jury trial, defendant Erwin Taylor a/k/a Irving Taylor was found guilty of two counts of aggravated battery of a peace officer. Based on his criminal history, the trial court sentenced him as a Class X offender to concurrent terms of eight years of imprisonment. On appeal, Mr. Taylor contends that his sentences are excessive given the nature of the offenses, his mental health issues that were apparent throughout trial, and other mitigating factors. He requests that we

reduce his sentences to the statutory minimum of six years. For the following reasons, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4       Mr. Taylor was charged, in relevant part, with two counts of aggravated battery of Chicago police officers Eduardo Echevarria and Mark White (720 ILCS 5/12-3.05(d)(4)(i) (West 2018)), for making physical contact of an insulting or provoking nature with the officers when he spit on them while knowing they were peace officers performing their official duties.

¶ 5                                     A. Pretrial Proceedings

¶ 6       Before trial, Mr. Taylor moved to proceed *pro se.* When the trial court attempted to examine him to determine whether he was making an informed choice, Mr. Taylor became belligerent and, when removed from court, screamed and used profane language. The court, questioning whether Mr. Taylor was competent to stand trial, ordered a behavior clinical examination (BCX).

¶ 7       At the next hearing, the court noted that Kristin Schoenbach, Psy.D., in a letter summarizing her conclusions based on the BCX, had concluded that Mr. Taylor was fit to stand trial and to represent himself. Mr. Taylor continued to interrupt proceedings and fail to listen to the court's attempts to admonish him, leading the court to state that it "[couldn't] imagine that they found him competent to stand trial." The court noted it was not required to accept Ms. Schoenbach's conclusion and "still [did not] know that [Mr. Taylor was] competent to represent himself." The court deferred its ruling on Mr. Taylor's motion to proceed *pro se* pending receipt of Ms. Schoenbach's detailed psychiatric summary.

¶ 8       At a later hearing, the court attempted to examine Mr. Taylor, who frequently interrupted. The court clarified that Mr. Taylor was not on psychotropic medication and noted that "the forensic people" had found him fit to represent himself. The court granted Mr. Taylor's request to proceed

*pro se*, noting that it believed he was "making a mistake."

¶ 9     At subsequent hearings, the court repeatedly noted Mr. Taylor's inattention and non-responsiveness. Just before the jury trial commenced, the court re-admonished Mr. Taylor and appointed standby counsel to assist him with procedural matters at trial.

¶ 10                                    B. Trial

¶ 11     At trial, Chicago police officer Nichole Salas testified that on November 29, 2018, at about 7:30 p.m., she and her partner, Officer Austin Morgan, responded to a call from a convenience store where they arrested Mr. Taylor. While being led to the squad car, Mr. Taylor was "kind of aggressive," uncooperative, and told Salas to "give him a kiss."

¶ 12     Mr. Taylor was transported to the 24th District police station processing room, where lockup procedures required that detainees be dressed in only a single layer of clothing. Mr. Taylor, who was wearing "quite a few layers," refused instructions to remove some of his clothing. He threatened the officers, saying "I can spit on you" or "I will spit on you" and told the officers they "[couldn't] do s*** about it." (R 361-62). He then "lunged at" Officer Morgan and spat on him. When additional officers arrived to transport Mr. Taylor to the 20th District for fingerprinting, he continued failing to listen to directions, saying insulting things, and "antagoniz[ing]" the officers. The State introduced video excerpts recorded by Officer Salas's and Officer Morgan's body-worn cameras that depict, *inter alia,* Mr. Taylor in a processing room, where, surrounded by several officers, he spits in the direction of the camera.

¶ 13     The parties stipulated that Mr. Taylor was arrested at 7:35 p.m. on November 29, 2018.

¶ 14     Officer White testified that at about 11:30 p.m. that night he and his partner were assigned to transport Mr. Taylor from the 24th District processing room. Two other officers were urging Mr. Taylor to remove his extra clothing. Officer White removed Mr. Taylor's outer pants after Mr.

Taylor refused to do so. Mr. Taylor was "very, very agitated" and, as the officers spoke to him, he "pulled back and spat at [Officer White's] chest." As Mr. Taylor "thrashed," officers handcuffed and restrained him on the ground. Officer White placed shackles on Mr. Taylor's ankles and called for an ambulance. A mask was placed on Mr. Taylor's face to prevent him from spitting.

¶ 15    Officer White escorted Mr. Taylor to the ambulance. Video excerpts played at trial depict Officer White removing Mr. Taylor's pants, whereupon Mr. Taylor spat at Officer White. Asked how Mr. Taylor's actions made him feel, Officer White testified, "Pretty *** disgusted, grossed out, just degraded. Like he thought I was subhuman." Officer White testified that he thought Mr. Taylor had spat at him in an attempt to provoke him.

¶ 16    On cross-examination, Officer White testified that he activated his body-worn camera only when he "felt there was a threat and [Mr. Tayor] was going to be aggressive," by which time the officers had already removed some of Mr. Taylor's clothing.

¶ 17    Officer Echevarria testified that he initially encountered Mr. Taylor at the processing room with his partner, Officer Julio Campos. Officer Echevarria was in uniform. The officers were responsible for monitoring Mr. Taylor that evening following a shift change and accompanied him to the hospital. Officer Campos rode in the ambulance while Officer Echevarria followed in a marked police vehicle. Mr. Taylor was still wearing the mask.

¶ 18    At the hospital, Officer Echevarria and Officer Campos waited outside Mr. Taylor's room and Officer Echevarria occasionally heard Mr. Taylor become "irate." The officers entered the room at the request of medical staff to assist them during their collection of blood or urine. Mr. Taylor pulled off his mask and spat in Officer Echevarria's face, hitting his nose, eyes, and chest, which Officer Echevarria found "[v]ery disturbing," "very uncomfortable," and "a sign of ***
disrespect." Officer Echevarria was admitted to the hospital and underwent an eye irrigation

- 4 -

procedure, which he testified was "very painful in a sense," involving "a tube going into [his] eyes" with a "fluid pack" that "was just constantly cleaning out [his] entire pupils."

¶ 19    On cross-examination, Officer Echevarria testified that his camera was not on at the hospital for privacy reasons.

¶ 20    Abraham Rivera testified that he worked the overnight shift as "secretary" in the emergency room of Swedish Covenant Hospital on November 29, 2018. At some point between 11 p.m. and midnight, Mr. Rivera went to Mr. Taylor's room and observed him on the bed, where he was yelling and being restrained while hospital staff inserted a urinary catheter. Mr. Rivera assisted in restraining Mr. Taylor and saw him pull down his mask and spit in the face of one of the officers who was present.

¶ 21    Mr. Taylor called several witnesses. Nurse Irene Perez testified she was working at Swedish Covenant Hospital in the early morning after Mr. Taylor's admission. A physician ordered catheterization for a urine screen after Mr. Taylor claimed to have ingested cocaine or heroin. Ms. Perez did not know whether Mr. Taylor had had the right to refuse treatment at that time.

¶ 22    On cross-examination, Ms. Perez testified that Mr. Taylor was combative before and during the catheter insertion procedure. Two uniformed officers wearing Chicago police badges were present. Ms. Perez saw Mr. Taylor spit at one of the officers, the spit landing on the officer's face.

¶ 23    Officer Campos testified that, after Mr. Taylor spat at Officer Echevarria at the hospital, he was "being aggressive" and Officer Campos restrained him by placing his knee on Mr. Taylor's chest.

¶ 24    On cross-examination, Officer Campos testified that Mr. Taylor was "verbally very combative" at the station and in the ambulance. Mr. Taylor pulled his mask down before spitting

in Officer Echevarria's face. Officer Echevarria appeared shocked and stunned.

¶ 25    Officer Morgan testified that between Mr. Taylor's arrest at about 8 p.m. and the request for transport at about 11 p.m., the police were completing the initial report of his arrest for shoplifting and administrative paperwork.

¶ 26    On cross-examination, Officer Morgan testified that Mr. Taylor spat into his body-worn camera and that saliva landed on Officer Morgan. Officer Morgan was required to activate his camera when initiating "public engagement" and to leave it activated until starting the administrative work for the arrest. He left his camera on in the processing room because Mr. Taylor "was acting overly aggressive."

¶ 27    The jury found Mr. Taylor guilty of the two counts of aggravated battery of a peace officer, premised on his spitting on Officer White and Officer Echevarria. Mr. Taylor filed a *pro se* motion for new trial. At his request, counsel was appointed to represent him. Counsel amended Mr. Taylor's motion for new trial, which the court denied.

¶ 28                                    C. Sentencing

¶ 29    The court-ordered PSI report reflected that Mr. Taylor had prior convictions for: assault in 2018 (30 days in jail); possession of a controlled substance in 2015, 1998, and 1995 (three years, three years, and one year in prison, respectively); driving under the influence on a revoked or suspended license in 2013 (two offenses; three-year and two-year prison terms); unlawful use or possession of a weapon by a felon in 2010 (four years in prison); four narcotics convictions in 2000 (sentences appear to be one year of probation but, after violation of probation, six years in prison "running current [*sic*] and consecutive"); robbery in 1996 (four years in prison); and five other less serious offenses.

¶ 30    In the PSI report, Mr. Taylor reported he was an only child, his childhood was good, and

he was raised in a stable home. His father died when he was in his teens, he had not spoken to his mother since 2012, and he had no contact with any relatives. Mr. Taylor was in special education classes while in grade school and did not finish high school. He reported that he had obtained his GED but could not recall when or where.

¶ 31    Mr. Taylor stated he was in the Illinois Department of Corrections most of his life, did not have a regular work history, and prior to his incarceration was homeless. He had been homeless since 2017. He was not involved in a relationship, had no children, and the last time he had a home was in the penitentiary. Mr. Taylor reported he had no psychological history and had never been diagnosed with a behavioral disorder. He used alcohol and marijuana, but not regularly, and denied using any other drug.

¶ 32    At the sentencing hearing, the State noted that "some of the felony cases got a little jumbled" in the PSI report and proceeded to clarify Mr. Taylor's criminal history. The State informed the court that Mr. Taylor had 13 prior felony convictions ranging from Class 4 to Class 1 offenses and was subject to mandatory sentencing as a Class X offender, such that a 6-to-30-year sentencing range applied. In addition to noting the 1996 "robbery Class 2" conviction, the State represented that Mr. Taylor had pled guilty to "three different matters" on "November 12th of 2011," resulting in two Class 1 felony convictions as follows:

> "The first was a manufacture and delivery, Class 1, for which he received six years Illinois Department of Corrections being sentenced as a Class X offender. The second case, which was consecutive, was Class 4 possession of a controlled substance reduced down from delivery case for which he receives [*sic*] one year ***. Those two cases were to run concurrent with a Class 1 manufacture and delivery case for which he received six years." (Paragraph breaks omitted.).

¶ 33    Regarding the current offenses, the State introduced two photographs and a brief video depicting Officer Echevarria in the hospital undergoing ocular irrigation. Officer Echevarria identified himself in the exhibits and testified that the tubes in his eyes delivered "[l]iquid gas."

¶ 34    The State recommended a 13-year sentence based on Mr. Taylor's criminal history, status as a Class X offender, and lack of remorse, as well as "the fact that *** there were also uncharged victims that the Court heard about."

¶ 35    In mitigation, defense counsel stated that Mr. Taylor had an eighth-grade education and had been homeless and "living on trains trying to survive" at the time of the offense. He had been in and out of prison since being sent to juvenile detention at age 14. His father was deceased, Mr. Taylor had lost contact with his mother, and he had little familial or community support. He had never received mental health treatment, but his grandmother "thought there might be some mental health issues." Counsel further noted that Mr. Taylor had been cooperative in representing himself at trial.

¶ 36    When offered the opportunity for allocation, Mr. Taylor cited rules governing body-worn cameras, challenged the accuracy of police reports, and criticized appointed posttrial counsel and the assistant state's attorney.

¶ 37    In imposing sentence, the court stated it had "listened to aggravation and mitigation." The court noted that Mr. Taylor had a "terrible" criminal background that included 13 prior felony convictions and had "talk[ed] about all these nonsense things about what the police did" while ignoring the video evidence. The court "didn't think anything that [Mr. Taylor] said" at trial "really had any gist" and the jury "obviously" did not either since they found him guilty. The court also pointed out that Mr. Taylor treated the officers "in such a heinous way that it's just mind boggling to [the court]." The court imposed concurrent sentences of eight years of imprisonment, noting the

sentences were "actually a gift."

¶ 38    Through counsel, Mr. Taylor moved to reconsider the sentences. The court denied the motion, explaining, in part, that he "got seven years last time" and the court "could have given him[ ] 10, 12, 13." The court concluded that, "based on the evidence presented and his terrible background," eight years was "appropriate under the circumstances."

¶ 39    Mr. Taylor now appeals. The Office of the State Appellate Defender was appointed to represent him but moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating there were no issues of arguable merit for appeal. On November 10, 2022, this court entered an order denying the motion, finding a nonfrivolous argument could be made that Mr. Taylor's sentences were disproportionate to the offense or an abuse of discretion given his "obvious mental health issues and the facts surrounding the aggravated battery charges themselves."

¶ 40                    II. JURISDICTION

¶ 41    Mr. Taylor was sentenced on March 12, 2020, and his motion to reconsider sentence was denied the same day. Mr. Taylor filed a timely notice of appeal on March 13, 2020. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 42                    III. ANALYSIS

¶ 43    On appeal, Mr. Taylor contends that his concurrent eight-year sentences are excessive given the nature of the offense, his mental health issues that were apparent throughout trial, and other mitigating factors. He asks this court to reduce the sentences to six years, the mandatory minimum for a Class X offense. We appreciate the vigor with which Mr. Taylor's counsel has

presented this argument. However, for the reasons that follow, we affirm the sentences of the trial court.

¶ 44    A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because the trial court is in a superior position to fashion an appropriate sentence based on its firsthand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Snyder*, 2011 IL 111382, ¶ 36. Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11.

¶ 45    In reviewing a sentence, this court will not reweigh the aggravating and mitigating factors or substitute our judgment for that of the trial court merely because we would have weighed those factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67. Sentences that fall within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 46    We find that the trial court did not abuse its discretion in sentencing Mr. Taylor to concurrent terms of eight years of imprisonment. Mr. Taylor was convicted of aggravated battery of a peace officer premised on making insulting or provoking contact, a Class 2 felony (720 ILCS 5/12-3.05(d)(4)(i), (h) (West 2018)) which ordinarily carries a sentencing range of three to seven

years in prison (730 ILCS 5/5-4.5-35(a), (l) (West 2020)). However, based on his prior criminal background, Mr. Taylor was sentenced as a Class X offender. This raised the sentencing range to anywhere from 6 to 30 years (730 ILCS 5/5-4.5-25(a), (l) (West 2020)). Because the eight-year sentences imposed in this case are within the statutory sentencing range, they are presumed proper and can only be reversed on a showing that they greatly vary from the spirit of the law or are manifestly disproportionate to Mr. Taylor's conduct. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105; *Stacey*, 193 Ill. 2d at 210.

¶ 47    Mr. Taylor concedes he was properly sentenced as a Class X offender and does not dispute that his sentences of eight years each fall within the permissible sentencing range and are therefore presumed proper. Mr. Taylor maintains that the sentences imposed are disproportionate to the nature of the offenses and that the trial court failed to consider "any significant mitigating factors" at sentencing, including his rehabilitative potential and "mental health issues."

¶ 48    Mr. Taylor first argues that his sentences are disproportionate to the nature of the offenses, as his spitting on the officers involved no risk of harm to the officers and was the "least significant conduct" that could constitute aggravated battery of a peace officer. The record is clear that the trial judge was aware of the details and seriousness of the offenses here. The court heard the evidence at trial, including the circumstances of Mr. Taylor's arrest and behavior towards the officers. It heard that, at the police station, Mr. Taylor threatened to spit on the officer and then lunged at Officer White and spat at him. It heard that, although he was handcuffed and wearing a mask, Mr. Taylor managed to remove the mask and spit at Officer Echevarria. The court also heard from Officer Echevarria, who recounted the "very painful" eye irrigation procedure he underwent in the hospital as a result of Mr. Taylor's conduct.

¶ 49    This was aggravated battery based on making physical contact of an insulting or provoking

nature with a police officer: physical harm to the victim is not an element of the offense charged. See 720 5/12-3.05(d)(4)(i), 12-3(a)(2) (West 2020). We do not find Mr. Taylor's sentences, which were only two years above the statutory minimum for what the legislature has declared to be the appropriate range of sentences for a Class-X offender, were excessive given these circumstances.

¶ 50    Mr. Taylor also argues the trial court failed to consider "any significant mitigating factors" at sentencing, including his "mental health issues which were apparent throughout trial and the commission of the offense." He argues that, at the time of the offenses, he "was suffering from a serious mental illness," which, though insufficient to establish an insanity defense, "substantially affected his *** ability to understand the nature of his *** acts or to conform his *** conduct to the requirements of the law," a factor that is listed as mitigating in section 5-5-3.1(a)(16) of the Criminal Code of 2012 (Code) (730 ILCS 5/5-5-3.1(a)(16) (West 2020)). Mr. Taylor argues it "was abundantly clear[,] from [his] erratic and agitated actions that led to these offenses and his outbursts throughout trial[,] that [he] is not mentally well."

¶ 51    Section 5-5-3.1(a)(16) provides that the following shall be considered in mitigation at sentencing: "[a]t the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law." The record demonstrates that the trial court was aware of the mitigating evidence presented regarding this factor.

¶ 52    In imposing sentence, the court expressly stated that it had "listened to aggravation and mitigation," and is presumed to have considered the mitigating evidence contained in the record (*Kindle*, 2021 IL App (1st) 190484, ¶ 67). This included counsel's argument in mitigation that Mr. Taylor had never received mental health treatment, but his grandmother "thought there might be

some mental health issues." The court had ordered the BCX examination that found Mr. Taylor fit to stand trial and represent himself. While Mr. Taylor's conduct and statements in court raise questions about his mental state, there is no evidence that he had a "serious mental illness" at the time of the offense, as contemplated by section 5-5-3.1(a)(16) of the Code. Moreover, even more than in most cases, the trial court was well aware of Mr. Taylor's apparent mental health issues, since Mr. Taylor chose to represent himself before the trial judge.

¶ 53    In addition to the mitigating evidence, the court was presented with aggravating evidence; particularly Mr. Taylor's extensive criminal history. See *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009) ("criminal history alone" may "warrant sentences substantially above the minimum"). The court sentenced Mr. Taylor to a term only two years above the statutory minimum and five years below the 13-year term requested by the State. Taking this record as a whole, we cannot find the court imposed a sentence greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. We are not free to reweigh the sentencing factors and impose a different sentence absent an abuse of discretion. *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 55. We find no such abuse on this record.

¶ 54                                    IV. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 56    Affirmed.